

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *ex rel.* SHERMAN MAREK, <br><br>     Plaintiff, <br><br>    v. <br><br> TENET HEALTHCARE CORPORATION, <br> VHS OF ILLINOIS, INC., <br> MACNEAL HEALTH PROVIDERS, INC. <br> CENTEGRA HEALTH SYSTEM, <br> ADVOCATE HEALTH CARE NETWORK, <br> ADVOCATE NORTH SIDE NETWORK, <br> ADVENTIST MIDWEST HEALTH, <br> PRESENCE HEALTH NETWORK, <br> SWEDISH COVENANT HOSPITAL, <br> ILLINOIS HEALTH PARTNERS, LLC, <br> NORTHWEST COMMUNITY HOSPITAL, <br> EDWARD-ELMHURST HEALTHCARE, <br> RUSH HEALTH, <br> RIVERSIDE HEALTHCARE, <br> RUSH UNIVERSITY MEDICAL CENTER, <br> FAMILY HEALTH NETWORK, <br> LAND OF LINCOLN MUTUAL HEALTH <br>   INSURANCE COMPANY, <br> METROPOLITAN CHICAGO HEALTHCARE <br>   COUNCIL, <br> MCHC-SERVICE CORPORATION, and <br> ILLINOIS HEALTH AND HOSPITAL <br>   ASSOCIATION, <br><br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> **1:17-cv-08755** <br> **Judge Ruben Castillo** <br> **Magistrate Judge Maria Valdez** <br><br> JURY TRIAL DEMANDED <br><br><br><br> **FILED** <br> DEC 0 5 2017 <br> **THOMAS G. BRUTON** <br> **CLERK, U.S. DISTRICT COURT** |

## COMPLAINT

Plaintiff Relator SHERMAN MAREK ("Relator" or "Marek"), by counsel and pursuant

to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), files this

Complaint against Defendants for knowingly submitting, causing, and conspiring in false

statements, false claims and reverse false claims harming the United States of America

("Government"), and in support thereof states as follows:

## I.     NATURE OF THE CASE

1.      The defendant hospitals and health systems ("Hospitals"), acting through their

local trade association, applied for a federal loan to start a new healthcare insurance company.

They were awarded $160,154, 812, which was paid in 14 installments over the period of January

2013 through February 2016.  The company, defendant Land of Lincoln Mutual Health

Insurance Co. ("Lincoln"), became insolvent and stopped operating as of September 30, 2016.

No part of the loan was ever repaid.

2.      The loan was made under the Consumer Operated and Oriented Plan ("CO-OP")

program of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18042.  As reflected in

its name, the program imposed two crucial conditions.  First, that Lincoln be "consumer

operated."  Second, that it be "consumer oriented."  Specifics of these requirements were

detailed in the statute itself, and in formal rules, regulations and other materials adopted under

statutory authority by the Centers for Medicare and Medicaid Services ("CMS").

3.      Regarding consumer operation, the Hospitals and their association, namely

defendant Metropolitan Chicago Healthcare Council ("MCHC"), were permitted to appoint

Lincoln's initial "formation" board of directors ("board").  However, the CO-OP program

required them to hold an election among Lincoln's insureds within a short period to replace the

formation board with an "operational board" of independent directors free of any conflict of

interest.  This requirement was particularly important in Lincoln's case because its "sponsoring"

Hospitals expected to have multi-million dollar contracts with Lincoln to provide services to its

insureds, and thus the Hospitals' financial interests were diametrically opposed to those of

consumers.

4.     Regarding consumer orientation, Lincoln was required to design and operate its insurance plans in a manner that would best serve the interests of consumers. Among other things, this meant being free of conflicts of interest, especially conflicts involving healthcare providers. It also meant maximizing the choices made available to consumers, and offering the widest practicable variety of plans, providers and service locations to the broadest range of potential enrollees. Of course, it also meant complying with laws intended to protect consumers, including antitrust and consumer fraud laws.

5.     Defendants knowingly failed to comply with the CO-OP loan requirements. Lincoln was not operated by its insureds, but was instead operated secretly by the Hospitals through fraudulent elections populating the Lincoln board with Hospital executives and proxies. Additionally, Lincoln was not operated for the benefit of its insureds, but instead fraudulently induced consumers to enroll in plans by concealing Lincoln's financial instability and risk of insolvency, and then funneled many millions of dollars in ill-gotten CO-OP loan proceeds, member premiums, and other monies into the Hospitals' pockets as the exclusive "business partners" of Lincoln.

6.     Defendants submitted, caused, and conspired in several false statements, false claims made to the Government, and reverse false claims avoiding repayment in connection with the $160 million CO-OP loan. Relator, who was fraudulently induced to enroll in a Lincoln plan and subsequently deprived of participation in any purported board "election," now brings this *qui tam* action under the FCA to recover the full amount of the loan, and other relief, for the Government.

## II.     JURISDICTION, VENUE AND PARTIES

7.     Relator brings this action on behalf of the United States of America for violations of the FCA, 31 U.S.C. §§ 3729-3733.

3

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 3732(a), which confer jurisdiction over actions brought under 31 U.S.C. §§ 3729 and 3730.

9.      This Court has personal jurisdiction over Defendants, and venue is proper here, pursuant to 31 U.S.C. §§ 3732(a) because Defendants are found, transact business, and committed acts prohibited by 31 U.S.C. § 3729 in this District.

10.     There has been no public disclosure, within the meaning of 31 U.S.C. § 3730(e)(4)(A), of substantially the same allegations or transactions as alleged in this action or claim in any federal criminal, civil, or administrative hearing in which the Government or its agent is a party; or in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media.

11.     Even if a public disclosure had occurred, Relator is an original source within the meaning of 31 U.S.C. § 3730(e)(4) because, prior to any public disclosure, he has voluntarily disclosed to the Government the information on which allegations or transactions in his claims are based, and he has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions, and he has voluntarily provided the information to the Government before filing this action in compliance with 31 U.S.C. § 3730(b)(2).

12.     Relator SHERMAN MAREK is a resident of Illinois.  He was fraudulently induced to enroll in a Lincoln plan for 2016 by Defendants' intentional failure to disclose Lincoln's financial instability and risk of insolvency.  Once enrolled, Marek was not afforded any opportunity to participate in a nomination or election process for the Lincoln Board, the purported results of which were announced in or around April 2016.

13.    The UNITED STATES OF AMERICA, real party in interest under the FCA, paid

$160,154,812 to Lincoln under the Consumer Operated and Oriented Plan program of the Patient

Protection and Affordable Care Act, 42 U.S.C. § 18042.

14.    Defendant LAND OF LINCOLN MUTUAL HEALTH INSURANCE

COMPANY ("Lincoln") is a Life, Accident and Health Domestic Mutual corporation formed by

the Hospitals, through MCHC, in April 2013 under the Illinois Insurance Code, 215 ILCS 5/1 *et*

*seq.*  Lincoln is the successor to Metropolitan Chicago Healthcare Council Co-Op ("MCHC CO-

OP"), an Illinois not-for-profit formed by the Hospitals, through MCHC, in September 2011 for

the purpose of obtaining the CO-OP loan from the Government.  In July 2016, Lincoln was

declared insolvent and placed under the control of the Illinois Department of Insurance ("IDOI")

pursuant to an agreed rehabilitation order issued by the Circuit Court of Cook County, Illinois.

In September 2016, that court entered an agreed liquidation order.  IDOI has appointed the

Office of the Special Deputy Receiver to handle Lincoln's unresolved matters, including a

pending appeal in Lincoln's $75 million "risk corridor" lawsuit against the Government.  *See*

*Land of Lincoln Mutual Health Insur. Co. v. United States,* No. 17-1224 (Fed. Cir.)  Lincoln is

found, transacts business, and committed acts prohibited by 31 U.S.C. § 3729 in this District.

Among other things, its main office was located in Chicago, Illinois.

15.    Defendant METROPOLITAN CHICAGO HEALTHCARE COUNCIL

("MCHC") is an Illinois not-for-profit corporation.  It is found, transacts business, and

committed acts prohibited by 31 U.S.C. § 3729 in this District.  Among other things, its main

office was located in Chicago, Illinois and it created and governed Lincoln on behalf of the

Hospitals throughout Lincoln's 2014-2016 period of operation.  Additionally, MCHC operated

Lincoln on a daily basis, directly and through MCHC-Service, pursuant to certain multi-million

5

dollar management and personnel contracts that MCHC and MCHC-Service, acting for Lincoln, entered into with themselves ("MCHC Contracts").

16.     Defendant MCHC-SERVICE CORPORATION ("MCHC-Service") is an Illinois for-profit corporation wholly owned and operated by MCHC. It is found, transacts business, and committed acts prohibited by 31 U.S.C. § 3729 in this District. Among other things, MCHC-Service employed the executive officers and other natural persons who operated Lincoln on a daily basis. Lincoln had no employees of its own, and was staffed only by persons subcontracted from MCHC and/or MCHC-Service.

17.     Defendant ILLINOIS HEALTH AND HOSPITAL ASSOCIATION ("IHA") is an Illinois not-for-profit corporation. It is found, transacts business, and committed acts prohibited by 31 U.S.C. § 3729 in this District. Among other things, IHA absorbed MCHC by merger on January 1, 2016 and controlled and operated MCHC, MCHC-Service and Lincoln as of that date, which was prior to the close of 2016 plan enrollment on January 31, 2016; prior to the Government's final CO-OP loan installment payment to Lincoln of $22,335,457 on February 25, 2016; and prior to the sham "election" for the Lincoln board in or around April 2016.

18.     Defendant TENET HEALTHCARE CORPORATION (collectively with the subsidiaries identified in this paragraph, "Tenet") is a Nevada for-profit corporation registered to do business in Illinois. It is the parent corporation of Defendant VHS OF ILLINOIS, INC. ("VHS"), a Delaware for-profit corporation that operates Defendant MACNEAL HEALTH PROVIDERS, INC., d/b/a Chicago Health Systems ("MacNeal/CHS"), which in turn operates four VHS-owned general acute care hospitals in Illinois, identified below. Tenet is found, transacts business, and committed acts prohibited by 31 U.S.C. § 3729 in this District. Among

other things, it held a seat on the MCHC and/or IHA boards of directors and was a business

partner of Lincoln with respect to their joint and co-branded plans for 2016.

19.     Defendant CENTEGRA HEALTH SYSTEM ("Centegra") is an Illinois not-for-

profit corporation.  Centegra owns and operates three general acute care hospitals in Illinois,

identified below.  Centegra is found, transacts business, and committed acts prohibited by 31

U.S.C. § 3729 in this District.  Among other things, it held seats on the MCHC and/or IHA

boards of directors, and on the Lincoln Board, and was a business partner of Lincoln with respect

to their joint and co-branded plans for 2016.

20.     Defendants ADVOCATE HEALTH CARE NETWORK, d/b/a Advocate Health

Care, and ADVOCATE NORTH SIDE HEALTH NETWORK, d/b/a Advocate Illinois Masonic

Medical Center (collectively "Advocate") are Illinois not-for-profit corporations.  Advocate

owns and operates eleven general acute care hospitals in Illinois, identified below.  Advocate is

found, transacts business, and committed acts prohibited by 31 U.S.C. § 3729 in this District.

Among other things, it held a seat on the MCHC and/or IHA boards of directors and was a

business partner of Lincoln with respect to their joint and co-branded plans for 2016.

21.     Defendant ADVENTIST MIDWEST HEALTH ("Adventist") is an Illinois not-

for-profit corporation.  Adventist operates four general acute care hospitals in Illinois, identified

below.  Adventist is found, transacts business, and committed acts prohibited by 31 U.S.C. §

3729 in this District.  Among other things, it held a seat on the MCHC and/or IHA boards of

directors and was a business partner of Lincoln with respect to their joint and co-branded plans

for 2016.

22.     Defendant PRESENCE HEALTH NETWORK ("Presence"), d/b/a Presence

Health, is an Illinois not-for-profit corporation.  Presence owns and operates eleven general acute

care hospitals in Illinois, identified below. Presence is found, transacts business, and committed acts prohibited by 31 U.S.C. § 3729 in this District. Among other things, it held a seat on the MCHC and/or IHA boards of directors and was a business partner of Lincoln with respect to their joint and co-branded plans for 2016.

23. Defendant SWEDISH COVENANT HOSPITAL ("Swedish Covenant") is an Illinois not-for-profit corporation. Swedish Covenant owns and operates a general acute care hospital located in Chicago, Illinois. Swedish Covenant is found, transacts business, and committed acts prohibited by 31 U.S.C. § 3729 in this District. Among other things, it held a seat on the MCHC and/or IHA boards of directors and was a business partner of Lincoln with respect to their joint and co-branded plans for 2016.

24. Defendants ILLINOIS HEALTH PARTNERS, NORTHWEST COMMUNITY HOSPITAL ("Northwest") and EDWARD-ELMHURST HEALTHCARE ("Edward-Elmhurst") (collectively "IHP") are Illinois not-for-profit corporations. Northwest and Edward-Elmhurst are partners in IHP, and collectively operate three general acute care hospitals in Illinois, identified below. IHP is found, transacts business, and committed acts prohibited by 31 U.S.C. § 3729 in this District. Among other things, Northwest and Edward-Elmhurst held seats on the MCHC and/or IHA boards of directors, and on the Lincoln Board, and IHP was a business partner of Lincoln with respect to their joint and co-branded plans for 2016.

25. Defendants RUSH HEALTH, RIVERSIDE HEALTHCARE, and RUSH UNIVERSITY MEDICAL CENTER (collectively "Rush/Riverside") are Illinois not-for-profit corporations. Rush Health is a network that includes four general acute care hospitals in Illinois, including Riverside Healthcare's Riverside Medical Center and Rush University Medical Center. Rush is found, transacts business, and committed acts prohibited by 31 U.S.C. § 3729 in this

District. Among other things, Rush Health/Rush UMC held seats on the MCHC and/or IHA

boards of directors, and on the Lincoln Board, and Rush/Riverside was a business partner of

Lincoln with respect to their joint and co-branded plans for 2016.

26.     Defendant FAMILY HEALTH NETWORK ("FHN") is an Illinois not-for-profit

corporation. It is not a hospital system, but rather a Medicaid health plan operated by a group of

hospitals, including Presence and Swedish Covenant. FHN is found, transacts business, and

committed acts prohibited by 31 U.S.C. § 3729 in this District. Among other things, its

controllers Presence and Swedish Covenant held seats on the MCHC and/or IHA boards of

directors, and FHN held a seat on the Lincoln Board was a business partner of Lincoln with

respect to their joint and co-branded plans for 2016.

### III.     FACTS

**A.     The "Consumer Operation" and "Consumer Orientation" Conditions
of Lincoln's $160 Million Loan Under The CO-OP Program.**

27.     Congress created the CO-OP program as a "federal [loan] program to assist

establishment and operation of non-profit, <u>member-run</u> health insurance issuers" to be known as

CO-OPs. 42 U.S.C. § 18042 (emphasis added). The material terms and conditions of CO-OP

loans were set forth in the statute, and in rules subsequently adopted by CMS. *See* 45 CFR §

156.500, *et seq.* CMS rules incorporated by reference (*id.* at § 156.510) all terms and conditions

set forth in the Funding Opportunity Announcement for CO-OP Loans, No. OO-COO-11-001 as

revised December 9, 2011 ("FOA"). As stated in CMS's CO-OP Program Guidance Manual

dated July 29, 2015 ("CO-OP Manual"), at pp. 3-4:

> To participate in this program, CO-OPs entered into a Loan
> Agreement with CMS as a condition of receiving loan funds from
> CMS. The Loan Agreement sets forth, among other things, the
> CO-OP Program's programmatic requirements. Per section 7.1 of
> the Loan Agreement, a CO-OP must satisfy and meet all applicable
> requirements of the Affordable Care Act, and

regulations…[including] but not necessarily limited to the
regulations codified at 45 CFR Part 156, the terms of the [FOA],
and any and all additional CO-OP Program guidance as may be
issued or released by CMS.

28.     One material condition, so critical that it was reflected in the program's title, was

that a CO-OP be "Consumer Operated." This meant being "organized under State law as a

nonprofit, member corporation" with "governance of the organization [] subject to a majority

vote of its members." 42 U.S.C. § 18042(c)(1)(A) and (c)(3)(A). Indeed, insisting that a CO-

OP's insureds have sole authority to elect its board of directors was the mechanism that Congress

relied on <u>exclusively</u> to ensure "consumer operation." CMS regulations further emphasized this

material condition of a CO-OP loan and imposed detailed requirements (42 CFR § 156.515(b)):

> **(b)  *Governance requirements.*** A CO-OP must meet the
> following governance requirements:
>
> **(1)  *Member control.*** A CO-OP must implement policies and
> procedures to foster and ensure member control of the
> organization. Accordingly, a CO-OP must meet the following
> requirements:
>
> **(i)** The CO-OP must be governed by an operational board with a
> majority of directors elected by a majority vote of a quorum of the
> CO-OP's members that are age 18 or older;
>
> **(ii)** All members age 18 or older must be eligible to vote for each
> of the directors on the organization's operational board subject to a
> vote of the members under paragraph (b)(1)(i) of this section;
>
> **(iii)** Each member age 18 or older must have one vote in each
> election for each director subject to a vote of the members under
> paragraph (b)(1)(i) of this section in that election;
>
> **(iv)** The first elected directors of the organization's operational
> board must be elected no later than one year after the effective date
> on which the organization provides coverage to its first member;
> the entire operational board must be elected or in place, and in full
> compliance with paragraph (b)(1)(i) of this section, no later than
> two years after the same date;
>
> **(v)** Elections of the directors on the organization's operation board
> subject to a vote of the members under paragraph (b)(1)(i) of this
> section must be contested so that the total number of candidates for

10

contested seats on the operational board exceeds the number of contested seats for such directors, except in cases where a seat is vacated mid- term due to death, resignation, or removal.

**(2)** *Standards for board of directors.* The operational board for a CO-OP must meet the following standards:

**(i)** Each director must meet ethical, conflict-of-interest, and disclosure standards;

**(ii)** Each director has one vote;

**(iii)** Positions on the board of directors may be designated for individuals with specialized expertise, experience, or affiliation (for example, providers, employers, and unions); and

**(iv)** [Reserved]

**(v)** *Limitation on government and issuer participation.* No representative of any Federal, State or local government (or of any political subdivision or instrumentality thereof) and no representative of any organization described in § 156.510(b)(1)(i) (in the case of a representative of a State or local government or organization described in § 156.510(b)(1)(i) with respect to a State in which the CO-OP issues policies), may serve on the CO-OP's formation board or as a director on the organization's operational board.

**(3)** *Ethics and conflict of interest protections.* The CO-OP must have governing documents that incorporate ethics, conflict of interest, and disclosure standards. The standards must protect against insurance industry involvement and interference. In addition, the standards must ensure that each director acts in the sole interest of the CO-OP, its members, and its local geographic community as appropriate, avoids self dealing, and acts prudently and consistently with the terms of the CO-OP's governance documents and applicable State and Federal law. At a minimum, these standards must include:

**(i)** A mechanism to identify potential ethical or other conflicts of interest;

**(ii)** A duty on the CO-OP's executive officers and directors to disclose all potential conflicts of interest;

**(iii)** A process to determine the extent to which a conflict exists;

**(iv)** A process to address any conflict of interest; and

**(v)** A process to be followed in the event a director or executive officer of the CO-OP violates these standards.

**(4)** *Consumer focus.* The CO-OP must operate with a strong consumer focus, including timeliness, responsiveness, and accountability to members.

29.      "Because it is impossible to meet this standard prior to actually enrolling members" (FOA, at 9), the Government authorized the "sponsor" who created and developed the CO-OP to appoint a "formation board" to temporarily govern the insurer for up to two years after starting coverage under its plans.  45 CFR §§ 156.505, 156.515(b)(1)(iv); FOA, at 9.  Crucially, however, the sponsor on or before that date was obligated to hold an election among its insureds to form an independent "operational board" to which the sponsor would transfer control.  *Id.*  By requiring a CO-OP to be organized as a nonprofit under state law, the ACA incorporated by reference those laws with respect to further details of board elections.  Under applicable Illinois law, "written notice [of members' meetings] stating the place, day, and hour of the meeting … shall be delivered not less than 5 nor more than 60 days before the date of the meeting…."  805 ILCS 105/107.15.  Of course, the requirements for member elections set forth in the ACA and CMS regulations could not be legitimately met without proper notice to member under Illinois state law.

30.      Another material condition, also so important that it was reflected in the program's title, was that a CO-OP be "Consumer Oriented," *i.e.* that it "operate with a strong consumer focus…."  42 U.S.C. § 18042(c)(4).  Being consumer oriented meant acting in its members' best interests in all ways, for example using any profits "to lower premiums, to improve benefits, or for other programs intended to improve the quality of health care delivered to its members" (42 U.S.C. § 18042(c)(4)), and to ensure that the CO-OP's directors, and thus the CO-OP itself, "acts in the sole interest of the CO–OP, its members, and its local geographic community as appropriate, avoids self dealing, and acts prudently and consistently with the terms

12

of the CO–OP's governance documents and applicable State and Federal law." 42 CFR §
156.515(b)(3).

31.     Such laws included state insurance laws, including laws relating to an insurer's
"market conduct." 42 U.S.C. §§ 18042(c)(5), 18044(b). Illinois law regarding an insurer's
market conduct prohibits unfair and deceptive acts and practices. 215 ILCS 5/423. Unfair acts
and practices include misrepresenting the insurer's financial condition in marketing materials.
*See, e.g.,* 215 ILCS 5/147-149. Thus, to the extent it would be otherwise unclear, a CO-OP loan
was conditioned on the CO-OP not fraudulently inducing consumers to enroll in its plans,
particularly on the basis of its financial condition. *See also*, 45 CFR 156.520(c)(3) (CMS may
terminate a loan and demand full repayment, including interest and penalties, if it "has reason to
believe that the organization engages in, or has engaged in, criminal or fraudulent activities or
activities that cause material harm to the organization's members…").

32.     Failure to comply with the conditions of a CO-OP loan, including consumer
operation and orientation, resulted not only in the suspension of future installment payments of
the loan, but also triggered an obligation to repay all <u>prior</u> installments, and potentially a ten-
percent penalty plus interest on the entire amount owed. 42 U.S.C. § 18042(b)(2)(C)(i) ("any
person receiving a loan or grant under the CO-OP program [must]…meet (and continue to
meet)" all program requirements); §18042(b)(2)(C)(iii) (if "a person has failed to meet any
requirement…such person shall repay to [CMS] an amount equal to the sum of 110 percent of
the aggregate amount of loans…plus interest"). *See also*, 45 CFR § 156.520(c)(3) (loan terms
include accelerated repayment of entire amount for non-compliance); FOA at 18, 19, 23.

33.     The conditions of a CO-OP loan were binding not only on the CO-OP itself, but
also on any third parties that the CO-OP might retain for any role or function. Thus, a CO-OP

was responsible for the compliance of all "delegated and downstream entities." 45 CFR §

156.340(a). *See also,* FOA at 18 (CMS could terminate a Loan Agreement and demand

repayment "if the [CO-OP], its providers and suppliers, or contracted entities performing

services on its behalf" violate program requirements); FOA at 23 ("to remain eligible for future

installment payments, a CO-OP was obligated to "require any contractors to comply with the

loan recipient's obligations related to the contractor's scope of work," and to "ensure that any

contract between the CO-OP and a contractor for administrative…services includes provisions

that protect consumer control of the organization.")

> **B.** **Claims Submitted To The Government In Connection With The CO-OP Loan, And Statements To The Government And To Consumers Material To Those Claims.**

34.     Lincoln, MCHC, MCHC-Service and IHA submitted several statements and

claims for payment to the Government in connection with Lincoln's loan application and

subsequent installment payments under the CO-OP program.  Additionally, the Hospitals joined

those Defendants in making and using additional statements to Relator and other consumers that

were material to claims for installment payments under the CO-OP program.  Lincoln

subcontracted the entirety of its management and staffing to MCHC-Service, and the natural

persons who submitted or caused the submission of statements and claims on behalf of Lincoln

to the Government, and to Relator and other consumers, were executives and other personnel

employed by MCHC and MCHC-Service (and/or IHA after its acquisition of those entities on

January 1, 2016).

35.     More specifically, in late 2012, MCHC caused Lincoln to enter into the MCHC

Contracts, effective January 1, 2013, hiring MCHC-Service, a wholly owned subsidiary of

MCHC, to supply all executive managers, financial and accounting management, human

resources, public relations, technology, and operational personnel to Lincoln.  Lincoln employed

no personnel of its own, and no one staffing Lincoln was independent of MCHC. Instead, all were employees of MCHC-Service who answered ultimately to the MCHC board. Indeed, the executive officers assigned to Lincoln were not only MCHC-Service employees, but were also interlocking officers of MCHC itself. For example, Kevin Scanlan, an employee of MCHC-Service assigned to be Lincoln's Chairman of the board, was also MCHC's President. Daniel Yunker, an employee of MCHC-Service assigned to be Lincoln's President, was also MCHC's Senior VP and Chief Financial Officer. Dennis Rizzo, an employee of MCHC-Service assigned to be Lincoln's Chief Financial Officer, was also MCHC's VP of Finance and Operations. Monica Katz, an employee of MCHC-Service assigned to be Lincoln's VP of Operations, was also MCHC's benefit plan director.

36.     Among other statements and claims, Lincoln, MCHC, MCHC-Service and/or IHA submitted at least 14 claims for payment in connection with Lincoln's CO-OP loan, one for each installment paid to Lincoln by the Government. Moreover, each payment was conditioned on Lincoln's compliance with the statutory, regulatory, and contractual requirements of the CO-OP loan program, in particular the requirements of consumer operation and consumer orientation. The Government's payments, categorized as either "startup" or "solvency" loans having different interest rates and repayment schedules, were made by the Government to Lincoln on the following dates in the following amounts:

| | | |
|---|---|---|
| January 7, 2013 | $ 6,205,000 | startup |
| April 5, 2013 | $ 800,000 | startup |
| April 23, 2013 | $ 175,000 | startup |
| April 23, 2013 | $ 2,000,000 | solvency |
| June 21, 2013 | $ 2,234,000 | startup |
| June 21, 2013 | $15,940,412 | solvency |
| September 20, 2013 | $ 2,027,412 | startup |
| December 20, 2013 | $ 4,240,000 | startup |
| March 21, 2014 | $ 259,000 | startup |
| March 27, 2014 | $19,570,589 | solvency |

| February 26, 2015 | $30,417,000 | solvency |
| August 7, 2015 | $18,610,942 | solvency |
| November 3, 2015 | $35,340,000 | solvency |
| February 25, 2016 | $22,335,457 | solvency |
| | --------------- | |
| TOTAL Payments: | $160,154,812 | |

37.     In addition to claims for payment associated with these 14 installments, Lincoln,

MCHC, MCHC-Service and/or IHA submitted other claims and statements to the Government in

connection with the CO-OP loan.  For example, Section 10 of Lincoln's loan agreement required

that it submit quarterly and semi-annual progress reports to CMS to assist in "monitoring

program integrity and compliance."  CO-OP Manual, at 5.  Lincoln's progress reports to CMS

included, among other things, copies of quarterly, semi-annual and annual reports submitted by

Lincoln to IDOI through the National Association of Insurance Commissioners ("NAIC

Reports"), as required for state licensing.  *Id.,* at 9-10.  On their front page, the NAIC reports

required the notarized signature of a CO-OP's CEO, President, CFO or similar top executive

officer, who was attesting "that this statement, together with related exhibits, schedules and

explanations therein contained…is a full and true statement…of the affairs of the said reporting

entity…."

38.     Lincoln's NAIC Reports contained this certification and other statements attesting

to compliance with various conditions of its CO-OP loan, including the consumer operation and

orientation requirements.  For example, Lincoln's "Statutory Financial Report with Supplemental

Information as of December 31, 2015," submitted to NAIC on or about May 31, 2016, stated at

p. 8 that Lincoln was "consumer operated and oriented," that it was "consumer-focused [and]

member-governed," and that it "was governed by its formation board of directors through April

1, 2014.  From and after April 2, 2014, the business and affairs of [Lincoln] are managed by a

permanent board of directors, elected by the members of [Lincoln]."

16

39.     In addition to progress and NAIC Reports submitted to CMS, Lincoln, MCHC,

MCHC-Service and/or IHA submitted tax returns to the IRS in order to claim the exemption

established for CO-OPs in 26 U.S.C. § 501(c)(29).  The exemption required, among other things,

compliance with the conditions of Lincoln's CO-OP loan, and Lincoln's Form 990 return made

that representation accordingly.  For example, Lincoln's Form 990 for 2014, filed in November

2015, attested at pp. 2 and 6 that ten of 11 members on Lincoln's Board were "independent" and

that Lincoln was "consumer operated and oriented."

40.     Moreover, Defendants made several statements to Relator and other consumers in

late 2015 and early 2016 that were material to Lincoln's claims to receive—and to keep—CO-

OP loan installments.  See 31 U.S.C. § 3729(a)(1)(G) (imposing liability not only for false

statements made to the Government, but more broadly to anyone when the statements are

"material to a false or fraudulent claim.")  As alleged more fully below, Defendants made several

statements to Relator and other consumers relevant to Defendants' sham elections for the

Lincoln board (section II. C. i., *infra*) and relevant to Defendants' fraudulent inducement of

Relator and other consumers to enroll in Lincoln plans (section II. C. ii., *infra*).  Those

statements included, as alleged fully below, a wide variety of hardcopy mailings and electronic

communications relating to the Lincoln plans, for example promotional brochures, plan

summaries, enrollment confirmation letters, a member guide, a resource guide, Explanations of

Benefits, and emails, all of which concealed the facts that (a) the Hospitals, and not consumers,

were controlling Lincoln, and (b) Lincoln was financially unstable and at risk of insolvency.  *Id.*

**C.    Defendants' Fraud In Connection With The CO-OP Loan.**

    **(i)    Lincoln Was Not "Consumer Operated," But Instead Operated By Defendants Though Proxies And Sham Elections.**

41.    As of January 1, 2016, Relator was over the age of eighteen and was an "individual covered under health insurance policies issued by" Lincoln, and was therefore a "member" entitled to participate in the election of its board of directors. 45 CFR §§ 156.505, 156.515(b)(1); 42 U.S.C. § 18042(c)(3). However, the Hospitals did not allow any legitimate election to occur, and thus Lincoln was not "consumer operated" in 2016 (or earlier for that matter). Instead, the Hospitals fraudulently operated Lincoln on their own in violation of statutory, regulatory and contractual requirements.

42.    The "results" of the purported 2016 Lincoln board election speak for themselves, as do those of the purported 2015 and 2014 elections. As alleged more fully below, no one was elected—or even nominated—except Hospital executives and proxies. The Hospitals achieved this result by failing to provide some or all insureds with proper notice of the date and time of the 2016 election; by failing to advise some or all insureds that "consumer operated" meant a board of directors elected by insureds and that they had the right to participate; and by presenting only Hospital executives and proxies as candidates, leaving insureds with no meaningful choice or impact at all, even if they learned of the election and voted.

43.    For example, Relator received no notice of the election as required by 805 ILCS 105/107.15. Relator received several communications from Lincoln between November 2015, when he enrolled in one of its plans, and April 19, 2016, when the Board election was purportedly held, but none of those communications specified a "place, day, and hour of the meeting" as required. *Id.* Omissive communications included those identified below (the Lincoln brochure, Lincoln plan summaries, enrollment confirmation letter, member guide, and

resource guide), as well as a hardcopy invoice (dated November 25, 2015); and several emails from Lincoln to Relator confirming enrollment (sent on November 30, 2015); outlining coverage (December 15, 2015 and December 30, 2015); confirming receipt of premiums (February 4, 2016, March 1, 2016, and March 29, 2016); and conveying "member news" (February 29, 2016 and April 6, 2017). Lincoln's website contended that all members would be supposedly sent an election notice and proxy form "in early March," but Relator never received one and has no reason to believe that any other members did.

44. Additionally, none of Lincoln's communications to Relator even mentioned a board election, or otherwise put Relator on notice such that he could contact Lincoln himself for details. In this regard, too, Relator has no reason to believe that he was treated uniquely, or that the boilerplate forms and emails sent by Lincoln to other insureds contained references to a board election in 2016 (even if general references would satisfy board election requirements under Illinois law, which they would not). After Lincoln became insolvent in July 2016, Relator found a version of Lincoln's website as it existed on March 27, 2016, and the website did in fact contain an obscure page about a supposed board election to be held on April 19, 2016. However, the page was buried among hundreds of other webpages, and nothing had given Relator or other insureds any indication this information existed, or a reason to go look for it.

45. Moreover, to the extent any Lincoln insureds were properly notified or managed to learn of a purported April 2016 election, the Hospitals prevented insureds from having any meaningful impact by having its "nominating committee" present only Defendants' own executives and proxies as candidates. Voters had only five candidates to choose from, four Hospital executives or proxies who are described more fully below (Kevin Scanlan, Melinda Kelly, Eric Spratford and Daniel Alex), plus Timothy Eckles, a Vice-President at Hospital Sisters

Health System in Springfield, Illinois ("HSHS"). Only one of the five candidates, namely Eckles, was not subsequently seated on the Lincoln Board, but he too was closely tied to the Hospitals; his superior, HSHS President/CEO Mary Starmann-Harrison, was on the board of IHA, successor to MCHC, in April 2016.

46. Depriving Relator and other insureds of notice and an opportunity to participate in any nomination and election process enabled the Hospitals, through IHA, MCHC and MCHC-Service, to manipulate the purported election and prolong their own control of Lincoln beyond the time allowed by the terms of their CO-OP loan. The Hospitals' fraudulent conduct as to the 2016 election was simply a continuation of misconduct dating back to April 2014 when they first claimed—falsely—to have relinquished control of Lincoln to consumers.

47. More specifically, the Hospitals, acting through Lincoln's nominal "sponsor" MCHC, created Lincoln's "formation board" in 2013 and filled all director positions with Hospital-related appointees, including top executive officers of MCHC and the Hospitals. For example, the Chairman of Lincoln's formation board was Kevin Scanlan (MCHC's President), its Treasurer was Vincent Pryor (CFO of Defendant Edward-Elmhurst), and additional directors included Brent Estes (CEO of Defendant Rush Health) and Jason Sciarro (President and COO of Defendant Centegra). Defendants Edward-Elmhurst, Rush/Riverside and Centegra all held seats on MCHC's board. All other directors on Lincoln's formation board were also appointed by, and connected to, the Hospitals, consisting of Juan Salgado (who had previously received money from MCHC and Defendant Rush for one of his projects), Melinda Kelly (who operated an entity that had Lincoln and MCHC-member hospital University of Chicago Medical Center as corporate members), James Gillespie (who operated an entity that had MCHC President Scanlan on its board and engaged in joint projects with MCHC), John Carpenter (who was an officer of

an entity having an executive of Defendant Presence on its board), and Marshall Hatch (who had worked with Defendant Rush on a previous project and was associated with an entity receiving money from Defendant Advocate).

48.     Although it was permitted, even expected, that a sponsor would temporarily control its own startup by filling the formation board with the sponsor's proxies, it was not permitted to for the sponsor to control the <u>subsequent operational</u> boards or manipulate the election process to that end.  Yet when Lincoln purportedly relinquished control to consumers by holding its first operational board election on April 1, 2014, each and every one of the nine Hospital proxies on the formation board was "elected" to the operational board (namely Scanlan, Pryor, Estes, Sciarro, Salgado, Kelly, Gillespie, Carpenter, and Hatch.)  The only difference between Lincoln's formation and operational boards was that four new directors were added to the latter, but all of them were Hospital proxies as well: Keith Kudla (CEO of Defendant FHN, an entity controlled by Defendants Presence and Swedish Covenant); Elliot Richardson (CEO of the Small Business Advocacy Council, an entity having MCHC President Daniel Yunker on its Executive Committee); J. Todd Phillips (who had been working with MCHC on the Lincoln startup venture as early as March 2010); and Larry L. Donaldson (a hospital and healthcare consultant with ties to MCHC and the Hospitals).  <u>None</u> of the directors on Lincoln's first operational board were free of conflicts of interest, much less were they prominent consumer advocates or other effective voices for Lincoln's rank-and-file insureds.

49.     Lincoln's purported "election" for the board in April 2015 was no more legitimate than the sham elections in April 2014 or April 2016.  In April 2015, ten of the Hospital proxies from 2014 were "re-elected," namely Scanlan, Pryor, Estes, Sciarro, Salgado, Kelly, Kudla, Richardson, Phillips and Donaldson.  The only new directors "elected" in April 2015 were also

Hospital proxies: Trisha Homans (a private healthcare consultant who was thereafter hired as Chief of Staff at Defendant Rush University Medical Center), and Richard Buchler (who operated a hospital supply company that solicited and sold products to hospitals). Like Lincoln's first operational board, none of the directors on Lincoln's second operational board were free of conflicts of interest, much less effective consumer advocates representing Lincoln's insureds as the ACA required.

50.     Similarly, the fraudulent election in April 2016, from which Relator and potentially tens of thousands of other Lincoln insureds were excluded, resulted in a Lincoln board consisting of Hospital executives and proxies. In April 2016, eight of the directors from 2015 retained their seats, namely Scanlan, Kelly, Richardson, Donaldson, Phillips, Kudla, Homans and Buchler, and the only new directors added were also Hospital proxies: Yunker (MCHC's CEO and its successor IHA's Executive Vice-President), Daniel Alex (who operated a hospital supply company that solicited and sold products to hospitals), and Eric Spratford (a faculty member at Defendant Adventist's La Grange hospital). Like Lincoln's first and second operational boards, none of the directors on Lincoln's third operational board were free of conflicts of interest, much less effective consumer advocates representing Lincoln's insureds as the CO-OP loan terms required. It is not clear how Yunker, who was not identified as a candidate on Lincoln's website as of March 27, 2016, managed to obtain a seat on the Lincoln board.

51.     In any event, the Hospitals did not need their proxies on the Lincoln Board to actively control Lincoln for the Hospitals' benefit, but only to "stay out of the way" while IHA, MCHC and MCHC-Service personnel operated Lincoln on a daily basis. Those persons, who ran Lincoln under the MCHC Contracts through 2015 and formal or informal extensions into

2016, were already controlled by the Hospitals through the Hospitals' seats on the MCHC and IHA boards. For example, Yunker, who was MCHC's CEO and IHA's Executive VP, and an employee of MCHC-Service, doubled as Lincoln's CEO, and Jason Montrie, who was an employee of MCHC-Service, doubled as Lincoln's President.

### (ii) Lincoln Was Not "Consumer Oriented," But Instead Sold Plans Designed By Defendants To Enrich The Hospitals.

52.     Defendants exercised their secret control over Lincoln to design and operate insurance plans for 2016 that funneled money (CO-OP loan proceeds, member premiums and more) to the Hospitals. Not only did Defendants fail to orient Lincoln to consumers, but in fact oriented Lincoln against consumers in many ways, including by restricting their choices and benefits when it suited the Hospitals' interests.

53.     Defendants Lincoln, MCHC, MCHC-Service and IHA were directly involved in the improper funnel design and operation of Lincoln plans for 2016. Lincoln acted solely through executives and other natural persons employed by MCHC, MCHC-Service and/or IHA and subcontracted to Lincoln. However, the Hospitals were also directly involved in the design and operation of Lincoln plans for 2016 because they were business partners of Lincoln who jointly designed and operated their respective co-branded plans. Moreover, the Hospitals coordinated their respective co-branded plans through Lincoln (*i.e.* MCHC, MCHC-Service and IHA personnel), agreeing with all other Hospitals on identical or parallel terms for their respective plans. Thus, while all of the Hospitals were also involved in the design and operation of Lincoln plans in their capacity as directors on the MCHC and IHA boards (and Centegra, IHP and Rush/Riverside in their capacity as directors on the Lincoln board), the Hospitals' participation and liability in the design and operation of Lincoln plans is direct rather than vicarious or derivative.

54.     Defendants oriented Lincoln's plans for 2016 to the Hospitals, and not consumers, by making the overwhelming majority of it plans "Preferred Partner 3-Tier Plans," with the Hospitals as the only "preferred partners." The 3-Tier plans offered the highest level of benefits for using a partner Hospital and its physicians, for example Tenet's four hospitals in Illinois and their physician groups (Tier 1); a far-distant second level of benefits for using a broader set of "in network" providers (Tier 2); and even less for using any other providers (Tier 3). Lincoln had not offered 3-Tier plans at all for 2014, and had balanced 3-Tier plans with traditional plans for 2015. However, the overwhelming majority of its plans for 2016 were 3-Tier plans, and all of those plans had a hospital sitting on the MCHC board as its partner. More specifically, 18 of 21 individual and family plans, and 30 of 37 small group plans, offered by Lincoln for 2016 were 3-Tier plans with Tenet, Centegra, Advocate, Adventist, Presence, Swedish Covenant, IHP, Rush/Riverside, or FHN (controlled by Presence and Swedish Covenant) as Lincoln's partner.

55.     Defendants also oriented Lincoln's plans for 2016 to the Hospitals, and not consumers, by dividing the Chicago-area market geographically to maintain proportionality to the funnels. For example, Lincoln's 3-Tier plans were generally limited to residents in counties where the respective Hospital maintained a facility, *e.g.* Tenet's 3-Tier plan was offered only in Cook County where its four hospitals were located. Of course, geographic restrictions were contrary to the interests of consumers, particularly commuters or others who might reside in one county but prefer to receive services in another county. Defendants made certain exceptions only when it suited their interests, for example allowing Centegra (whose CEO was Chairman of the MCHC Board, and whose CFO was Treasurer of the Lincoln Board) to sell its 3-Tier plans in Lake County in addition to McHenry County where its three hospitals were located. Indeed, Defendants imposed geographic limits even within a Hospital's own system when it suited them.

For example, Adventist's 3-Tier plan included only its Glenoaks and Hinsdale hospitals at the Tier 1 level of benefits, leaving consumers near the Adventist La Grange hospital to Tenet's nearby Westlake hospital, and leaving consumers near Adventist's Bolingbrook hospital to nearby Presence hospitals.

56.     Even when it came to Lincoln's "standard" PPO plans for 2016, *i.e.* its handful of offerings apart from 3-Tier plans with a partnering Hospital, Defendants could not help but favor themselves at the expense of consumers' interests.  For example, virtually all hospitals in the Chicago metropolitan area were "in network" under Lincoln's standard PPO plans, except for certain hospitals that competed directly in the same neighborhood as a facility run by one of the Hospitals.  The excluded hospitals included Ingalls Memorial (near Defendant Advocate's South Suburban facility); Jackson Park Hospital and Roseland Hospital (both near Defendant Advocate's Trinity facility); Methodist Hospital (near Defendant Swedish Covenant); and Silver Cross Hospital (near Defendants Adventist's Bolingbrook and Presence's Joliet facilities).

57.     By exercising their secret control over Lincoln to design and operate insurance plans for 2016 that funneled money to the Hospitals and not their competitors, and by maintaining a rough proportionality to those funnels at the expense of consumer choice , Defendants acted in their own interests and not in a "consumer oriented" fashion.  In turn, by orienting Lincoln's business to themselves, the Hospitals not only steered many millions of dollars in CO-OP loan money and member premiums to themselves, but also many millions of dollars more in the form of deductibles, co-insurance, co-pays and other charges paid directly by Lincoln's insureds and not by the company itself.  In fact, setting aside their obligation to orient Lincoln to consumers and focusing instead on their mere obligation to comply with all applicable federal and state laws, Defendants' coordinated conduct also violated the Sherman Act.

### (iii) Lincoln Was Not "Consumer Oriented," But Instead Operated By Defendants To Fraudulently Induce Enrollment.

58. Defendants not only usurped control of Lincoln through sham "elections," contrary to the CO-OP loan's consumer operation requirement, and exercised that control to create funnels to the Hospitals, contrary to the loan's consumer orientation requirement, but further abused consumers by fraudulently inducing enrollment in Lincoln's 2016 plans in order to <u>maximize</u> the flow of money through the funnels. More specifically, Defendants agreed to, and did, consciously and actively conceal Lincoln's financial instability and insolvency risk from potential enrollees, including Relator.

59. On or about November 25, 2015, Relator enrolled in a Lincoln healthcare insurance plan through the online exchange established under the ACA ("Marketplace"), specifically he enrolled in the Land of Lincoln Health Traditional Gold PPO for 2016. Relator was not aware of Lincoln's financial instability or risk of insolvency at the time of his enrollment, and if he had known he would not have enrolled. The Marketplace's open enrollment continued through the end of January 2016, and Relator was free to cancel his Lincoln plan and enroll in a substitute plan during that period. Relator did not become aware of Lincoln's financial instability or risk of insolvency during that period, however, and if he had learned of them he would have cancelled his Lincoln plan and enrolled in a substitute plan.

60. At or around the date of his enrollment, Relator received and reviewed several communications and marketing materials from Lincoln pursuant to its standard policies and procedures. For example, Lincoln posted on the Marketplace a 20-page brochure entitled "Individual & Family Health Insurance Plans" and several 8-page "Summaries of Benefits and Coverage" (one for each of several different types of Lincoln plans). Additionally, within days of enrolling in a Lincoln plan, Relator received hardcopies in the U.S. mail of a letter from

26

Lincoln confirming his successful enrollment in its plan; a "Member Guide" containing information about the plan; and a "Resource Guide" containing the Summary for his plan, a copy of his full insurance policy, and related documents. Additionally, Relator received a hardcopy invoice from Lincoln dated November 25, 2015, and emails from Lincoln on November 30, 2015, December 15, 2015, and December 30, 2015, on various subjects related to his enrollment.

61. None of these communications disclosed the material facts that Lincoln was financially unstable; that it was at heightened risk of a mid-year insolvency in 2016; that it was expected to have, and did have, an operating loss of $91 million for calendar year 2015; that it was dependent on certain "risk corridor" funds that it had anticipated receiving in October 2015 and anticipated receiving again in October 2016; that IDOI and CMS had expressed concern about Lincoln's financial viability; and that Lincoln was operating under "corrective action plans" imposed by IDOI and CMS for that reason. Additionally, all of these materials omitted the material fact that Lincoln was not in "consumer operated," but was instead still operated by the Hospitals as a result of sham board of director "elections." Relator relied on these omissive materials in enrolling in a Lincoln plan for 2016, and also relied on them in remaining enrolled in the Lincoln plan through the date on which Relator could change plans, namely January 31, 2016.

62. By the time Lincoln became insolvent in July 2016 and Relator's plan was terminated, the Hospitals had benefited greatly from their decision to operate Lincoln into 2016 and not close it at the end of 2015. Operating Lincoln in 2016 was a "no lose" proposition for the Hospitals, regardless of Lincoln's potential insolvency and consequent severe harm to insureds if a mid-year shutdown occurred. Making the most of Lincoln's final nine months, the Hospitals implemented dozens of "Partner" plans funneling money to themselves and few plans

allowing it to go anywhere else. Lincoln paid out $77,353,702 to hospitals and other providers through the first six months of 2016 alone, and at least another $40 million by the time coverage ended on September 30, 2016, much of it to the Hospitals and their physician groups. Additionally, apart from funds paid to them by Lincoln, the Hospitals and their physicians were paid millions of dollars in 2016 by consumer enrollees directly in the form of deductibles, co-pays and co-insurance amounts.

63.     As alleged above, the Hospitals were the sole "partners" for Lincoln's individual and family plans in 2016. As partners, the Hospitals jointly with Lincoln, IHA, MCHC and MCHC-Service executives and personnel designed and distributed the marketing and enrollment materials bearing their respective names, specifically Lincoln's "Preferred Partner 3-Tier PPO Plans." In addition to jointly designing and distributing omissive materials regarding their respective Partner plans, each Hospital agreed with each other, and with Lincoln, MCHC and MCHC-Service executives and staff, that omissive communications would be designed and distributed for all Lincoln plans. Without that aspect of Defendants' agreement, and if the material fact of Lincoln's financial distress had been disclosed in connection with any Lincoln plan or in any other form or forum, it would have defeated the purpose of the omissive communications and instead prevented enrollments.

64.     Like MCHC, IHA and MCHC-Service, whose executives and personnel operated Lincoln on a daily basis, each Hospital was acutely aware of Lincoln's financial instability and potential insolvency because the Hospitals were governing Lincoln through their seats on the Lincoln, MCHC and/or IHA boards of directors.

65.     By exercising their secret control over Lincoln to fraudulently induce enrollment in Lincoln's 2016 plans, a scheme rooted in the Hospitals' conflicts of interest that would not

have been perpetrated if fellow consumers had been governing Lincoln, Defendants acted in their own interests and not in a "consumer oriented" fashion. Defendants' artificial inflation of Lincoln's enrollment not only increased the amount of insureds' premiums funneled to the Hospitals, but also contributed to Lincoln's satisfaction of a CO-OP loan enrollment milestone that triggered payment of the Government's final installment of $22,335,457 on February 25, 2016. Setting aside their obligation to orient Lincoln to consumers and focusing instead on their mere obligation to comply with all applicable federal and state laws, Defendants' coordinated conduct also violated the Illinois Consumer Fraud Act.

    **D.**    **Defendants' False Statements. False Claims And Reverse False Claims Were "Knowing."**

    66.    Each and every Defendant acted with actual knowledge, reckless disregard, and/or deliberate ignorance in submitting, causing and conspiring in false statements and false claims submitted to the Government in connection with Lincoln's loan under the CO-OP program, and in connection with Lincoln's failure to repay the loan in full when non-compliance with CO-OP requirements triggered that obligation. The false statements, false claims and reverse false claims arose from the Hospital's deliberate strategy of usurping control of Lincoln through sham "elections," and then using that control to design and operate a collection of insurance plans that funneled money to themselves in way that was indifferent, and often contrary, to the interests of consumers. Indeed, the Hospitals vastly increased the amount of money flowing to themselves by concealing Lincoln's financial instability and risk of insolvency, thereby fraudulently inducing consumers to enroll in Lincoln plans.

    67.    As demonstrated by allegations throughout this Complaint, Defendants' misconduct was "knowing" in nature. Among other things, Lincoln, MCHC, MCHC-Service and IHA systematically and repeatedly lied to the Government over a long period of time in

29

quarterly NAIC Reports, and in annual tax returns, falsely claiming that the Hospitals had turned control of Lincoln over to consumers. The Hospitals also systematically and repeatedly lied to consumers over a long period of time in omissive marketing materials that falsely stated or implied financial stability and solvency. The Hospitals in their own names participated directly in the latter, jointly designing and disseminating the marketing and enrollment materials for their respective Preferred Partner plans and coordinating those efforts with all other Hospitals offering such plans.

68.     In short, each and every Defendant acted with actual knowledge, reckless disregard, and/or deliberate ignorance in submitting, causing and conspiring in the false statements, false claims and reverse false claims alleged herein, including but not limited to false claims corresponding to the 14 installment payments of the CO-OP loan; false statements to the Government in NAIC Reports and IRS filings; and omissive and fraudulent marketing and enrollment materials conveyed to consumers such as the Lincoln brochure, Lincoln plan summaries, enrollment confirmation letters, member guide, resource guide, and emails confirming receipt of monthly premiums.

69.     Moreover, the fact that each and every Defendant acted with actual knowledge, reckless disregard, and/or deliberate ignorance is demonstrated by the details of their conspiratorial agreement with each other, as alleged fully below.

**E.     All Defendants Conspired In The False Statements, False Claims And Reverse False Claims.**

**(i)     Hospitals and Non-Hospitals**

70.     As evidenced in the following detailed allegations, each of the Defendants, including Lincoln, MCHC, IHA, MCHC-Service, Tenet, Centegra, Advocate, Adventist, Presence, Swedish Covenant, IHP, Rush/Riverside, and FHN, agreed with each other to defraud

the Government of $160,154, 812 by submitting, and or causing the submission of, false statements to the Government and to consumers; false claims to the Government; and avoiding repayment to the Government when CO-OP program non-compliance triggered an obligation to repay the loan. More specifically, each of the Defendants knew and agreed with each other that several false statements and false claims would be submitted by Lincoln, MCHC, IHA and/or MCHC-Service to the Government, including the claims and statements alleged above: (a) 14 false claims for payment, one for each of the 14 installments paid over the course of January 2013 through February 2016; (b) false NAIC Reports; and (c) false tax returns. Additionally, each of the Defendants knew and agreed with each other that false statements material to their false CO-OP loan claims would be made and used with respect to consumers, including the Lincoln brochure, Lincoln plan summaries, enrollment confirmation letters, member guide, resource guide, and email communications. Finally, each of the Defendants knew and agreed with each other to continue to conceal their wrongdoing in order to improperly avoiding repayment of the CO-OP loan.

71. Additionally, each of the Defendants, including Lincoln, MCHC, IHA, MCHC-Service, Tenet, Centegra, Advocate, Adventist, Presence, Swedish Covenant, IHP, Rush/Riverside, and FHN, agreed with each other as to the misconduct causing claims and statements submitted to the Government to be false, including as alleged above: (a) violating the CO-OP loan requirement of consumer operation by secretly operating Lincoln through proxies and holding only sham "elections" for Lincoln's board; (b) violating the CO-OP loan requirement of consumer orientation by designing insurance plans to funnel money to the Hospitals rather than benefit consumers; and (c) violating the requirement of consumer

orientation by concealing Lincoln's financial instability and risk of insolvency while marketing and selling its plans to consumers.

72.     The non-Hospitals (Lincoln, MCHC, IHA and MCHC-Service) knew of the sham elections, and that the Lincoln board consisted solely of Hospital proxies, because MCHC, IHA and MCHC-Service employees operated Lincoln on a daily basis and took orders from the MCHC and IHA boards of directors rather than from Lincoln's board.  Similarly, those employees participated in the design and operation of Lincoln's insurance plans, which funneled many millions of dollars in CO-OP loan proceeds, insureds' premiums, and other funds to the Hospitals.  Finally, those employees also created and implemented Lincoln's marketing and sales policies and practices for its 2016 plans, including the policy and practice of concealing Lincoln's financial instability and risk of insolvency.

73.     For their part, the Hospitals (Tenet, Centegra, Advocate, Adventist, Presence, Swedish Covenant, IHP, Rush/Riverside, and FHN) knew of the sham elections, and that the Lincoln board consisted solely of Hospital proxies, because they contributed their own top executives to be those proxies, and/or had top executives on the MCHC and/or IHA boards that were secretly controlling Lincoln.  Moreover, the Hospitals jointly with Lincoln designed and operated their respective co-branded plans to benefit themselves rather than consumers, and were the recipients of many millions of dollars in CO-OP loan proceeds, insureds' premiums, and other funds.  Finally, the Hospitals jointly with Lincoln marketed and sold their respective co-branded plans, and necessarily agreed to conceal Lincoln's financial instability and risk of insolvency because disclosure by even one Hospital would "let the cat out of the bag" and doom the scheme for all of them.

### (ii)   Individual Hospitals

74.   *Defendants Tenet, VHS and MacNeal/CHS.*  MacNeal/CHS operates four general acute care hospitals in Illinois, namely MacNeal Hospital in Berwyn ("MacNeal Hospital"), Weiss Memorial Hospital in Chicago ("Weiss Hospital"), West Suburban MC in Oak Park, and Westlake Hospital in Melrose Park.. MacNeal/CHS was a Preferred Partner of Lincoln, and together they jointly designed, marketed, sold and operated four health insurance plans for 2016 ("CHS plans"), namely "Chicago Health System Lincoln 3-Tier PPO plans" at the gold and silver levels in the individual and family category and gold and silver in the small group category.  These 3-Tier plans were available to residents of Cook County only, where Tenet's hospitals are located, and not to residents of other counties.  MacNeal/CHS's parent corporations, Defendants Tenet Healthcare Corporation and VHS of Illinois, Inc., actively controlled, managed and participated in MacNeal/CHS's activities with respect to Lincoln and the CHS plans.  These Defendants entered into an agreement with all other Defendants to defraud the government in the manner described herein and through the individuals in their employ took affirmative steps towards realizing the fraudulent scheme.  Those individuals were MacNeal/CHS's CEO, J. Scott Steiner, who was a Director on the MCHC board in 2015 and Tenet Healthcare Corporation's CEO of the Northwest Region, Anthony Tedeschi, who was also CEO of MacNeal/CHS's Weiss Hospital, and who was a Director on the IHA board in 2016. Specifically, these individuals, on behalf and for the benefit of Defendants Tenet, VHS, and MacNeal/VHS, used their positions of control over Lincoln to fraudulently prevent Lincoln's members from electing a board of their choosing, and to fraudulently operate Lincoln to benefit Tenet, VHS, MacNeal/CHS and other Defendants.

75.   *Defendant Centegra.*  Centegra owns and operates three general acute care hospitals in Illinois, namely Centegra Hospital-McHenry, Centegra Hospital-Woodstock, and

Centegra Hospital-Huntley. Centegra was a Preferred Partner of Lincoln, and together they jointly designed, marketed, sold and operated five health insurance plans for 2016 ("Centegra plans"), namely "Centegra Lincoln 3-Tier PPO Plans" at the gold and silver levels in the individual and family category and platinum, gold and silver in the small group category. These 3-Tier plans were available to residents of McHenry County, where Centegra's hospitals are located, and nearby Lake County, but not to residents of other counties. Centegra entered into an agreement with all other Defendants to defraud the government in the manner described herein and through the individuals in its employ took affirmative steps towards realizing the fraudulent scheme. Those individuals were Centegra's CEO, Michael S. Eesley, who was a Director on the MCHC board in 2015, and was also a Director on the IHA board in 2016, and Jason Sciarro, Centegra's CFO, who was a Lincoln Director and Treasurer in 2015 and 2016. Specifically, these individuals, on behalf and for the benefit of Centegra, used their positions of control over Lincoln to fraudulently prevent Lincoln's members from electing a board of their choosing, and to fraudulently operate Lincoln to benefit Centegra and other Defendants.

76. *Defendant Advocate.* Advocate owns and operates 11 general acute care hospitals in Illinois, namely Christ Medical Center in Oak Lawn; Condell Medical Center in Libertyville; Good Samaritan Hospital in Downers Grove; Good Shepherd Hospital in Barrington; Illinois Masonic Medical Center in Chicago; Lutheran General Hospital in Park Ridge; Sherman Hospital in Elgin; South Suburban Hospital in Hazel Crest; and Trinity Hospital in Chicago; BroMenn Medical Center in Normal; and Eureka Hospital in Eureka. Advocate was a Preferred Partner of Lincoln, and together they jointly designed, marketed, sold and operated five health insurance plans for 2016 ("Advocate plans"), namely "Champion Lincoln 3-Tier PPO Plans" at the gold and silver levels in the individual and family category and platinum, gold and silver in

the small group category. These 3-Tier plans were available to residents of Cook, Lake, Kane and DuPage Counties only, where Advocate's hospitals are located, and not to residents of other counties. Advocate entered into an agreement with all other Defendants to defraud the government in the manner described herein and through the individuals in its employ took affirmative steps towards realizing the fraudulent scheme. Those individuals were Susan Nordstrom Lopez, President of Advocate Hospital Illinois Masonic, who was a Director on the MCHC board in 2015, and Advocate's Chief Operating Officer, William Santulli, who was a Director on the IHA board in 2016. Specifically, these individuals, on behalf and for the benefit of Advocate, used their positions of control over Lincoln to fraudulently prevent Lincoln's members from electing a board of their choosing, and to fraudulently operate Lincoln to benefit Advocate and other Defendants.

77. *Defendant Adventist.* Adventist owns and operates four general acute care hospitals in Illinois, namely Adventist Bolingbrook Hospital in Bolingbrook; Adventist GlenOaks Hospital in Glendale Heights; Adventist Hinsdale Hospital in Hinsdale; and Adventist La Grange Medical Center in La Grange. Adventist was a Preferred Partner of Lincoln, and together they jointly designed, marketed, sold and operated seven health insurance plans for 2016 ("Adventist plans"), namely "Adventist Lincoln PPO Plans" at the gold, silver and bronze levels in the individual and family category and platinum, gold, silver and bronze in the small group category. These 3-Tier plans were available to residents of Cook, DuPage and Kane Counties only, where Adventist's hospitals are located, and not to residents of other counties. Adventist entered into an agreement with all other Defendants to defraud the government in the manner described herein and through at least one individual in its employ took affirmative steps towards realizing the fraudulent scheme. That individual was Adventist's President and CEO,

35

David L. Crane, who was a Director on the MCHC board in 2015, and who was also a Director on the IHA board in 2016. Specifically, this individual, on behalf and for the benefit of Adventist, used his position of control over Lincoln to fraudulently prevent Lincoln's members from electing a board of their choosing, and to fraudulently operate Lincoln to benefit Adventist and other Defendants.

78.     *Defendant Presence.* Presence owns and operates 11 general acute care hospitals in Illinois, namely Mercy Medical Center in Aurora; Resurrection Medical Center in Chicago; Saint Francis Hospital in Evanston; Saint Joseph Hospital in Chicago; Saint Joseph Hospital in Elgin; Saint Joseph Hospital in Joliet; Saint Mary Hospital in Chicago; Saint Elizabeth Medical Center in Chicago; and St. Mary's Hospital in Kankakee; Covenant Medical Center in Urbana; and United Samaritans Medical Center in Danville. Presence was a Preferred Partner of Lincoln, and together they jointly designed, marketed, sold and operated five health insurance plans for 2016 ("Presence plans"), namely "Presence Lincoln 3-Tier PPO Plans" at the gold and silver levels in the individual and family category and platinum, gold and silver in the small group category. These 3-Tier plans were available to residents of Cook, DuPage and Kane Counties only, where Presence's hospitals are located, and not to residents of other counties. Presence entered into an agreement with all other Defendants to defraud the government in the manner described herein and through the individuals in its employ took affirmative steps towards realizing the fraudulent scheme. Those individuals were Presence's Executive Vice-President, David A. DiLoreto, who was a Director on the MCHC board in 2015, and Presence's CEO, Michael Englehart, who was a Director on the IHA board in 2016. Specifically, these individuals, on behalf and for the benefit of Presence, used their positions of control over

Lincoln to fraudulently prevent Lincoln's members from electing a board of their choosing, and to fraudulently operate Lincoln to benefit Presence and other Defendants.

79. *Defendant Swedish Covenant.* Swedish Covenant owns and operates one general acute care hospital in Illinois, specifically its namesake facility in Chicago. Swedish Covenant was a Preferred Partner of Lincoln, and together they jointly designed, marketed, sold and operated five health insurance plans for 2016 ("Swedish Covenant plans"), namely "Swedish Covenant Lincoln 3-Tier PPO Plans" at the gold and silver level in the individual and family category and platinum, gold and silver in the small group category. These 3-Tier plans were available to residents of Cook County only, where Swedish Covenant's hospital is located, and not to residents of other counties. Swedish Covenant entered into an agreement with all other Defendants to defraud the government in the manner described herein and through at least one individual in its employ took affirmative steps towards realizing the fraudulent scheme. That individual was Swedish Covenant's President and CEO, Mark Newton, who was a Director on the MCHC board in 2015. Specifically, this individual, on behalf and for the benefit of Swedish Covenant, used his position of control over Lincoln to fraudulently prevent Lincoln's members from electing a board of their choosing, and to fraudulently operate Lincoln to benefit Swedish Covenant and other Defendants.

80. *Defendants IHP, Northwest, and Edward-Elmhurst.* Defendant IHP is a partnership between Defendants Northwest and Edward-Elmhurst, which collectively operate three general acute care hospitals in Illinois. Northwest operates Northwest Hospital in Arlington Heights, and Edward-Elmhurst operates Edward Hospital in Naperville ("Edward") and Elmhurst Memorial Hospital in Elmhurst ("Elmhurst"). IHP was a Preferred Partner of Lincoln, and together they jointly designed, marketed, sold and operated five health insurance plans for

2016 ("IHP plans"), namely "Illinois Health Partners Lincoln 3-Tier PPO Plans" at the gold and silver levels in the individual and family category and platinum, gold and silver in the small group category. These 3-Tier plans were available to residents of Cook, DuPage and Kane Counties only, where IHP's hospitals are located, and not to residents of other counties. These Defendants entered into an agreement with all other Defendants to defraud the government in the manner described herein and through the individuals in their employ took affirmative steps towards realizing the fraudulent scheme. Those individuals were IHP's Stephen Scogna, CEO of Northwest, who was a Director on the MCHC Board in 2015, Pam Davis, CEO of Edward-Elmhurst, who was a Director on the IHA board in 2016, and Vincent Pryor, Edward-Elmhurst's CFO, who was a Lincoln director and Treasurer in 2015 and 2016. Specifically, these individuals, on behalf and for the benefit of Defendants IHP, Northwest, and Edward-Elmhurst, used their positions of control over Lincoln to fraudulently prevent Lincoln's members from electing a board of their choosing, and to fraudulently operate Lincoln to benefit IHP, Northwest, Edward-Elmhurst and other Defendants.

81. *Defendants Rush Health, Riverside Healthcare, and Rush University Medical Center.* Defendant Rush Health is a health network that includes Defendants Riverside Healthcare and Rush University Medical Center. Collectively, they operate four general acute care hospitals in Illinois, namely Riverside Medical Center in Kankakee, Defendant Rush University Medical Center in Chicago ("Rush UMC"), Rush Oak Park Hospital in Oak Park, and Rush-Copley Medical Center in Aurora ("Rush-Copley').. Riverside was a Preferred Partner of Lincoln, and together they jointly designed, marketed, sold and operated two health insurance plans for 2016 ("Rush/Riverside plans"), namely "Riverside Lincoln 3-Tier PPO Plans" at the silver levels in the individual and family category and small group category. These 3-Tier plans

were available to residents of Kankakee County only, where Riverside's hospital is located, and not to residents of other counties. These Defendants entered into an agreement with all other Defendants to defraud the government in the manner described herein and through the individuals in their employ took affirmative steps towards realizing the fraudulent scheme. Those individuals were Rush's Barry C. Finn, President and CEO of Rush-Copley, who was a Director on the MCHC board in 2015; Riverside's CEO, Phillip Kambic, who was a Director on the IHA board in 2016; and Brent Estes, Rush Health's CEO and Rush UMC's Senior VP, who was a Lincoln director and Treasurer in 2015 and 2016. Specifically, these individuals, on behalf and for the benefit of Defendants Rush/Riverside, used their positions of control over Lincoln to fraudulently prevent Lincoln's members from electing a board of their choosing, and to fraudulently operate Lincoln to benefit Rush/Riverside and other Defendants.

82.     *Defendant Family Health Network.* Family Health Network is a Medicaid health plan operator. It was a Partner of Lincoln, and together they jointly designed, marketed, sold and operated four health insurance plans for 2016 ("FHN plans"), namely "Family Health Network Lincoln 3-Tier PPO Plans" at the silver and bronze levels in the individual and family category and silver and bronze in the small group category. FHN entered into an agreement with all other Defendants to defraud the government in the manner described herein and through two entities holding seats on both FHN's board and MCHC's board, as well as at least one individual in FHN's employ, took affirmative steps towards realizing the fraudulent scheme. The two entities that held seats on both FHN's board and MCHC's board were Presence and Swedish Covenant. The individual in FHN's employ was FHN's CEO, Keith Kudla, who was on the Lincoln board in 2015 and 2016. Specifically, these entities and individual, on behalf and for the benefit of FHN, used their positions of control over Lincoln to fraudulently prevent Lincoln's

members from electing a board of their choosing, and to fraudulently operate Lincoln to benefit

FHN and other Defendants.

## COUNT I

### FALSE CLAIMS
### VIOLATING 31 U.S.C. § 3729(a)(1)(A)

83.     Relator realleges and incorporates by reference all foregoing paragraphs.

84.     This Count, asserted against all Defendants, states a claim for treble damages,

civil penalties and other relief for false claims submitted in violation of the False Claims Act, 31

U.S.C. § 3729(a)(1)(A).

85.     As alleged herein, Defendants knowingly presented, or caused to be presented, to

the United States government a false or fraudulent claim for payment or approval.

86.     The United States government, unaware of the false or fraudulent nature of these

claims, paid such claims when they would not otherwise have been paid.

87.     By reason of these payments, the United States government has been damaged,

and continues to be damaged, in an amount exceeding $160 million.

## COUNT II

### FALSE STATEMENTS
### VIOLATING 31 U.S.C. § 3729(A)(1)(B)

88.     Relator realleges and incorporates by reference all foregoing paragraphs.

89.     This Count, asserted against all Defendants, states a claim for treble damages,

civil penalties and other relief for false statements conveyed to the United States government and

to consumers in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

90.     As alleged herein, Defendants knowingly made, used, or caused to be made or

used a false record or statement material to a false or fraudulent claim presented to the United

States government.

91.     The United States government, unaware of the false or fraudulent nature of these statements, paid claims when they would not otherwise have been paid.

92.     By reason of these payments, the United States government has been damaged, and continues to be damaged, in an amount exceeding $160 million.

## COUNT III

### REVERSE FALSE CLAIMS
### VIOLATING 31 U.S.C. § 3729(a)(1)(G)

93.     Relator realleges and incorporates by reference all foregoing paragraphs.

94.     This Count, asserted against all Defendants, states a claim for treble damages, civil penalties and other relief for reverse false claims in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

95.     As alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to an obligation to pay or transmit money or property to the United States government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

96.     The United States government was unaware of the false or fraudulent nature of these records or statements, concealments, improper avoidances, or decreased obligations to pay, and had it known of them the government would have demanded reimbursement of claims previously paid.

97.     By reason of this failure to repay, the United States government has been damaged, and continues to be damaged, in an amount exceeding $160 million.

## COUNT IV

### CONSPIRACY
### VIOLATING 31 U.S.C. § 3729(a)(1)(C)

98.     Relator realleges and incorporates by reference all foregoing paragraphs.

41

99.     This Count, asserted against all Defendants, states a claim for treble damages, civil penalties and other relief for conspiracy to submit false claims and false statements in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

100.    As alleged herein, Defendants knowingly conspired to present, or cause to be presented, to the United States government a false or fraudulent statement or false or fraudulent claim for payment or approval.

101.    The United States government, unaware of the false or fraudulent nature of these statements and claims, paid such claims when they would not otherwise have been paid. Additionally, had it known of the false or fraudulent nature of these claims, records or statements, concealments, improper avoidances, or decreased obligations to pay, the government would have demanded reimbursement of claims previously paid.

102.    By reason of these payments, and failure to repay, the United States government has been damaged, and continues to be damaged, in an amount exceeding $160 million.

## PRAYER FOR RELIEF

WHEREFORE, Relator Sherman Marek respectfully request that this Court award following relief:

a.     To the United States, repayment of 110 percent of the aggregate amount of its CO-OP loan, plus interest on that amount for the period it was outstanding, as provided in 42 U.S.C. § 18042(b)(2)(C)(iii);

b.     To the United States, three times the amount of its damages as provided in 31 U.S.C. § 3729(a)(1);

c.     To the United States, the maximum amount of civil penalties that may be imposed as provided in 31 U.S.C. § 3729(a)(1);

d.      To Relator, the maximum "relator's share" that may be awarded as provided in 31 U.S.C. § 3730(d);

e.      To the United States and Relator, all expenses of this action, including attorneys' fees and costs, as provided in 31 U.S.C. § 3729(a)(3) and 31 U.S.C. § 3730(d); and

f.      all other relief deemed necessary and proper by the Court.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Sherman Marek hereby demands a trial by jury.

DATED:        December 5, 2017                MOOR LAW OFFICE, P.C.
                                              s/ Edward Roy Moor
                                                  erm@moorlaw.net
                                              MOOR LAW OFFICE, P.C.
                                              One N. LaSalle Street, Suite 600
                                              Chicago, Illinois 60602
                                              (312) 726-6207

                                              Ross B. Brooks
                                                  rbrooks@sanfordheisler.com
                                              SANFORD HEISLER SHARP, LLP.
                                              1350 Avenue of the Americas
                                              31st Floor
                                              New York, NY 10019
                                              646-402-5668

                                              Andrew H. Miller
                                                  amiller@sanfordheisler.com
                                              SANFORD HEISLER SHARP, LLP.
                                              1666 Connecticut Avenue NW
                                              Suite 300
                                              Washington, D.C. 20009
                                              (202) 499-5212

                                              *Counsel for Relator*